So, we have Miss Boghossian, Boghossian, okay, please go ahead whenever you're ready. Good morning, Your Honors, and may it please the Court, I'm Jennifer Bagassi for the Plaintiff Appellant Maya Hendrix. I would like to reserve three minutes for rebuttal. The fundamental question before this Court is whether the Court below erred in dismissing Miss Hendrix's claims by drawing all inferences from the complaint in the City's favor rather than Miss Hendrix's favor as it should have. Specifically, the central question is whether the Court ignored substantial portions of the 911 calls in which the dispatcher defendants acted to convince Appellant's mother, Misty Hendrix, that a report that her daughter was kidnapped for ransom was a scam, that it fit the hallmarks of a common scam. They told her not to pay the ransom. They told her that this was a ploy for drug money. They told her that she could not her daughter and did not know her daughter. So you're addressing the dispatchers in the plural as a group and referring to them as they, but shouldn't the District Court and shouldn't we consider the actions of each dispatcher separately? That is correct, Your Honors. So in this case, we're referring to the initial dispatcher, Marvin. Her liability gives rise to the duty that arises from the special relationship that was created when Dispatcher Marvin convinced Miss Hendrix that, Misty Hendrix, that her daughter's kidnapping was a scam, convinced her not to pay the ransom. And then the later dispatchers merely confirmed the policy of the City and of the City defendants to treat purported kidnappings as scams if the locations were uncertain, if the person didn't have their phone, wasn't able to call on a whim. So those two dispatchers, and that is Dispatcher Davis and Orozco, are evidence of the City's policies of treating kidnapping reports as scams. So let's focus on a number two, who I think it's second dispatcher. What about what she said? Indicates anything about a policy regarding kidnapping allegations or any sort of advice or direction about that? So Miss Davis, who is the second dispatcher, stated that this wasn't an emergency, that she would have to call, that Misty would have to call the non-emergency line. But then Dispatcher Orozco on the non-emergency line, when discussing why Miss Davis, why Dispatcher Davis had hung up, Dispatcher Orozco said, well, it's because these are common scams. So, and Anna, I mean, so Judge Beatty, picking up Judge Beatty's point about looking at each individual dispatcher and whether each individual would have liability or the possibility of liability, can we, in considering Davis, think about Orozco's statements? Why would that inform Davis's liability, what Orozco is saying in terms of interpreting what Davis may or may not have said? Or I guess, did say, we have the transcript, so we don't have to worry about what was actually said. So Orozco seems to sort of explain or, yeah, explain what Davis was saying or why she did what she did. But why does that inform Davis's liability? Because there appears to be no other plausible reason from that record as to why Dispatcher Davis would have said that this wasn't an emergency. You know, Misty Hendricks was saying, how is this not an emergency? My daughter is kidnapped. She's going to be killed. She's being held for ransom. Why is this not a subject for 911? And Davis did respond, well, it's not an emergency. Why else? Isn't your ultimate theory that the dispatchers convinced mom not to pay the ransom, which puts daughter in worse danger than she already was in? That is correct. There's nothing that I can see that Davis says that says anything about paying the ransom, not paying the ransom, getting involved, not getting involved. She's just talking about how the city is viewing this situation. That is correct, Your Honor. And that is why our principal allegations center around the words of Dispatcher Marvin. And the physical abuse, the torture, the deprivation of rights accelerated, became worse, put Maya Hendricks in worse danger after Misty Hendricks did not pay the ransom after speaking multiple times to Dispatcher Marvin. At that point, after that point, the kidnappers and Maya Hendricks called Misty and Misty could hear Maya being tortured in the You have not paid the ransom. You're not taking this seriously. That is the tipping point. That is the point at which this went from she is kidnapped to now the danger has accelerated because Misty Hendricks was convinced enough to hold off paying the ransom, not to pay the ransom. The kidnappers accelerated their mistreatment of Maya Hendricks and went from simply holding her to physically assaulting her. So if nothing else, that escalation to physical assault was the result of that affirmative act by Dispatcher Marvin to convince Misty Hendricks that the kidnapping was a scammed. So enough doubt in her mind to cause her to hold off paying the ransom. I won't belabor the elements of the record and the points in which Dispatcher Marvin called the kidnapping a scam, but I will point out that it was the first three minutes and 22 seconds of that call. Dispatcher Marvin was talking about how this was a common scam and gathering information about the kidnappers and about the call that seemed designed not to help, but designed to decide or judge in her later words, whether this is true or not. It wasn't until four minutes in that she even asked for Maya Hendricks' name. If Marvin had not made those statements about, look, there's a likelihood that this is a scam. If he hadn't, she hadn't said those things, but simply said, we can't help you. Goodbye. Would the, would the outcome be different? Yes. Sorry. So it wasn't the denial of relief. It was the persuasion that you think made matters worse. That is absolutely correct. If they had just denied, if they had said, we don't know that we can do anything with that. Is there any evidence of how that might've changed the outcome? Yes, your honor, as we've alleged in the complaint, even though Misty Hendricks did not have the money directly on her, her mother had a savings account for her cancer that could have been used to pay the ransom. She also was aware that as an adult with a job, she could have gone down the street to get a payday loan. No, she didn't have it on her. No, her mother didn't have it immediately, but she kept saying to Maya and the kidnappers, oh, I'm trying to get it. But then she never actually did anything to get it. And I believe that we have alleged sufficient facts to show that without the interference of dispatcher Marvin to convince Misty Hendricks, that this wasn't real, or at least it was highly likely that this wasn't real, that she would have taken those steps. She would have gone out. She would have got the money and got it to the kidnappers. And then they would not have become angered, said you're not taking this seriously and begun torturing Hendricks. The dispatcher acted his or her peril in when there's a request for an emergency help. If the dispatcher tries to tell the person calling that, look, there may be another more innocent explanation. Don't, don't have a heart attack about this yet. Let's be, let's think about it and see what else we can do. Anything like that is, is absolutely going to be in your of creating liability for this, for the state. That would, if, if the dispatcher goes out of their way, nothing about how we don't know whether they're out of their way or not, it seems to me like it's a, it's a response to a very anxious mother. And you're saying any effort to calm the mother down or to say, well, maybe it's not as bad as you think it is. All of that's Not any time, your honor. That's not, that's not what we're asserting here. I recognize that both a special relationship doctrine and the state created danger doctrine are limited. Uh, and your honor, I, uh, I would, uh, I would submit that this, these facts are quite unique because the dispatcher dispatcher Marvin was not merely trying to calm down, uh, Misty Hendricks, not trying to tell her that there might be an alternate explanation, but in fact, spent several minutes going through the facts, not only for the purposes of helping, but the purpose of determining, as she said, I'm trying to judge judge whether this is real or not. I'm, you know, and then once Maya's history of drug use came into the conversation, then Marvin's dispatcher, Marvin's biases came into the conversation in which she said, once a person's on meth, you can't trust a thing. She says, Marvin had made one additional statement and said, look, there might be alternatives. I am not trying to persuade you to do one thing or another. That's your business, not mine, but just for your consideration, I'm going to try to explain some other possibilities. Let's, I want you to think about them. Would the outcome be different potentially? I mean, I'm just, I'm, I'm just concerned about how dispatchers are going to read, read whatever we write here and, and how much is going to restrict their ability to have dialogue, meaningful dialogue with people in extremist situations. I understand your honor. And that is a concern. Obviously we want our dispatchers to be able to do as they see fit within reason and outside a situation involving gross negligence. Here, we have a dispatcher who is using her bias against people who use drugs and people who struggle with addiction. And she is actively instructing Misty Hendricks, do not pay the ransom. You will enable her if there had been some mitigating language, like you suggest, I believe that would have been different. Speak briefly to whether the, whether the, the city has a policy of not, not intervening in missing people that are alleged to be held for hostage. I may have missed overstated that policy. What was the city policy? The city policy was a policy of treating kidnapping reports, hostage reports as scams until, and unless the victim's location could be ascertained. And that was, or less what? Unless the victim's location could be ascertained. That's almost an impossibility of many times, isn't it? I mean, if I were a kidnapper, the last thing I'd want to reveal would be the location. Which was my point. Exactly. And I believe we alleged it in the second amended complaint, but Ms. Cahill who was acting on behalf of the city was the chief of dispatch at the time acknowledged that if there was no location, uh, that this was not something that would be taken seriously and would be in conjunction with the, uh, the, the statements of the dispatchers, this is going to be treated as a scam because they don't have a location. Thank you. Thank you, your honor. Uh, quickly, I will reserve two minutes of my time before rebuttal, but I did want to address one brief point, which is the dismissal under a rule 41B for disobedience of court order. In this case, um, that, uh, that decision should be reversed for abuse of discretion. First of all, it was without prejudice, so it should not affect our ability to relitigate the issue. If the court finds we have a colorable claim under federal law. Second, the cases that have held that, uh, a rule 41B dismissal is appropriate where an amendment to a complaint was not made in a statement of intent not to amend was not filed. Those cases all involved, uh, mandatory, uh, orders where a person was required to file an amended complaint. In this case, it was plaintiff will have 30 days to file an amended complaint, not must file an amended complaint, as was the case in Yorish where the plaintiff even asked the court for more time to file the amended complaint and then didn't. Uh, that is all I have for now, Thank you. Miss Plotkin-Wolf. Good morning, your honors. May it please the court. Stacey Plotkin-Wolf on behalf of the appellees, the three 911 dispatchers, the dispatch administrator, the former San Diego chief of police, and the city of San Diego. We ask that the court affirm the district court's orders dismissing this case under Rule 12 and Rule 41B. The appellant failed to fulfill her burden to prove or plead, I should say, a plausible claim under Rule 12 for both the state-created danger doctrine and the state law special relationship claim. Furthermore, she did not show that it was not within the court's discretion to dismiss the federal causes of action under Rule 41B. The crux of what Dispatcher Marvin told Misty Hendricks can be found at ER 74, line 7 through 19 as follows. And you know, it may well be that your daughter is in some sort of a difficult position, but you cannot help her. And I would almost guarantee if you manage to send her $2,500, they're going to call and ask for more. This is the way it always goes with these kind of things. So the best thing she can do is, if she needs help to call 911, you know, find out, you know, whatever she can do, if we can get kind of a, the neighborhood of where she's at, or if she can describe something, but there's just, there's no way to find her without some sort of an address and her phone can't be traced. So we don't even have a starting point. That was what the crux of the conversation Dispatcher Marvin had with Miss Hendricks. Throughout the conversation, she was consistently asking her to provide some information to help the police start a search for her daughter. Misty Hendricks did not know her daughter's current home address. She did not know any of her friends or associates' phone numbers or locations. There was nowhere for police to start. Now, while plaintiff makes a point, plaintiff appellate makes a point of saying that Miss Marvin quickly went into the scam issues and took too long to ask for any information with regard to Miss Hendricks' information, she neglects to tell the court that during that time period, she stayed on hold while Misty Hendricks spoke with her daughter and immediately asked if she was able to give her any more information about where her daughter was. She also doesn't tell the court that she put the information out on the radio to the officers. So it wasn't like they weren't looking for her, but they didn't have anywhere to start. I don't, I don't understand the plaintiff's argument or theory in this case to be that the, that Dispatcher Marvin or any of the others just failed to do their job at all. I think the argument is that things were said that convinced mom not to take action that may or may not have helped the daughter get out of a really terrible situation. And so on that, you know, focusing on that theory, in the transcript with our first dispatcher, we have, I mean, the things that you have described, they're there, of course. She's, she's trying to figure out the location. She is trying to assist mom in figuring out this situation and get officers out there and they're running into roadblocks because we don't know where this girl is. But then she also says things like, don't enable her and sending her money is just going to enable things. And that's like, that's a different step that a dispatcher that then I would expect a dispatcher to take that seems to be sort of inserting herself and her opinions into this situation and giving advice about what mom should do or not do in this situation. And, and why isn't that a fair reading of that? And, and why isn't that at least on a motion to dismiss enough to get past the pleading stage on this theory that the dispatcher has inserted herself and is directing mom to do this or that? It's an unreasonable inference based on the totality of the dispatch recordings. If you look at it in context with what was said before and right after those comments, there was a whole dialogue about how they knew that Misty Hendricks did not have the money. If you look at the entire transcript, you will see that Ms. Hendricks told Ms. Marvin at least seven times that she did not have the money. It didn't matter whether or not Ms. Marvin was telling her that it was a scam or it could be a scam is actually what the transcript said, that they have lots of these calls and that many of them are scams. And this is consistent with those calls. It didn't matter that she said that because Misty Hendricks told her that at one point, that maybe she could send a couple of hundred dollars. And another time that said that she had only $10 to her names, that her parents couldn't send the money because her mother was undergoing cancer treatment, that she did not have any way to get the money. She told her daughter she was trying to get the money, but she knew she didn't have that money. So I think there's also facts in the record that mom was aware she could have gotten a payday loan and that she would have, which is inconsistent with the record. And the case law is, do you disagree that that those facts are in this record? Yes, it is. It is in the record. It is inconsistent with the recordings that were made on the day of this incident. And the case law is we're at the pleading stage. So maybe that's true. Maybe you at the evidence stage get to discredit that. But at the pleading stage, we take the allegations in favor of the plaintiff. And if she alleges it would have been difficult, but I could have gotten the money if I really needed to. And I didn't because this dispatcher convinced me that it wasn't actually a kidnapping and I really shouldn't send money because this was just a scam to get drug money. Under Sprewell v. Golden State Warriors, when the items that are incorporated into the record by reference, such as the audio recordings here, are inconsistent or directly contradict what is in the complaint, we don't consider what is in the complaint at all. In fact, so tell me, can you point me to a specific point in the transcript where the mom definitively says there's no way I'm getting this money? It's not possible. I can actually, Your Honor. She says at ER 61-10, to that page for you. Line 10? Line 10. You know, I told her she knows I don't have money like that. And then at ER 65, line 23, she says, I can't see Maya lying about this knowing I don't have money to give her. You know what I mean? She knows my mom is sick and we don't have the money. Excuse me. We don't have it. And then again, at page 67, line 22, she says, you know what I mean? If it was a couple hundred dollars, I could see like her, you know, lying because I could send her a couple hundred dollars, but 2,500, there's no way. And then again, on page 70, at ER 70, at line 25, it says, you know, I don't have that kind of money. My mom and dad don't have that kind of money. You know, I'm trying to get it. And then at 72, on five to eight, she says, but my mom and dad don't have that kind of money right now either. My mom has cancer and you know, Maya should know that. She knows she has cancer, but she knows they don't have money. And then at 70, at age 76, line two, she says, I have $10 to my name. So that directly contradicts what Maya, what Misty Hendricks says, I'm sorry, what the complaint says about Misty Hendricks being able to get the money, specifically about her being able to get the money from her parents. Cause she says throughout her conversations that her parents don't have the money. And in fact, Maya Hendricks, according to the recordings, called her grandmother twice, five hours before they called 911 for the first time before calling her mother. That's what the record is here. So it is directly inconsistent with what is now in the complaint, which by the way, is the third or fourth complaint. In this case, there was one, two complaints in state court before it was removed to federal court. And I can't remember if the second complaint in state court was the original complaint in federal court. Now we're on the second amendment complaint here. So the judge told appellant when he granted the motion to dismiss the first time what she needed to do to fix her complaint and she did not do it. That is in the record as well. Nothing the dispatchers did or didn't do caused appellant to be kidnapped or exposed her to a danger she did not already face. That her kidnappers would actually follow through with the threats that they were making. The dispatchers did not take her from a safety and place her in the hands of the kidnappers. She had already been kidnapped by people who were threatening to kill her. She was not placed in a worse situation by the actions or alleged inactions by these dispatchers. But in this case, could this case be compared to Arista, the case where the police told the woman that not to search for her husband, that they would conduct a search and then they decided that he wasn't really missing, he was just having an affair, so they didn't search for him and then he died out in the woods. So it seemed that the point of that case was that what the government agents did was make the situation more dangerous because they dissuaded the wife from initiating a search for her husband. And here I think the theory is they dissuaded for the mother from making any attempts to obtain money and to pay ransom. So Dispatcher Marvin's statements could be interpreted as making the danger worse. Well first, as the record shows from the recordings, Ms. D. Hendricks told the dispatchers, Ms. Marvin, over and over again that she couldn't get the money. So there was no reason for the dispatcher to think that she was persuading her not to get the money. But secondly, directly answering your question about Arista, those facts were significantly different. In that situation, the law enforcement agency said that they were taking care of the search, so don't worry about it. And then they delayed several hours while the commander came to the scene or to the home and she overheard him talking about, oh he must be having an affair, so we're not going to actually start the search until the morning. And then he told her, please don't do a search, we're going to do the search. And after she realized they weren't going to do the search and she was concerned about hypothermia and she told him about the reason that hypothermia was a concern, he still didn't want to start the search to the morning. And eventually she did start the search and unfortunately he had succumbed to hypothermia at that point. But the difference in Arista versus here is that law enforcement had already taken control of the situation and said that they were going to do the search. Here the dispatch had clearly told them that there was nothing they could do until they had somewhere to start. They took the steps of trying to track the phone, they took the steps of trying to get any and all information to try to figure out where Maya Hendrix was, including asking Misty Hendrix to call the lady from Narcotics Anonymous again. So the district court made a statement that the dispatchers were not trying to convince Misty of anything, let alone that the kidnapping was a scam. If that's an incorrect inference from this record and that in fact they were trying to convince her that the kidnapping was a scam, does that make any difference? No it doesn't, Your Honor, because regardless of whether they convinced her it was a scam or not, Misty Hendrix did not have the ability to get the money according to the transcript of these audio recordings. But regardless, it is not an incorrect interpretation of what the transcript said. The transcript clearly says that it could be a scam, this is why it could be a scam. And there are also comments from Marvin about how this could not be a scam and this could very well be a serious situation. She needs to have her daughter call 9-1-1 the next time she talks to her because only the police can help her, they don't know where she is. That's what the full transcript is and that is what plaintiff is ignoring. I'm troubled by if we were to make this case turn on whether or not Misty had the power to get money. Misty, there's all kinds of ways you might be able to get money with friends or loans or other things, and it seems to me that if we go down that road and say if you don't have any means to get money, you're going to have to put up with more advice not to do anything than if you do, that line troubles me. I'd much rather focus on what in fact they told told anybody and how anybody would interpret it. And that does go to Your Honor's comments earlier about what dispatchers should be free to be able to tell people when they're on the phone with them and how to do their jobs. That's probably not as well said as Your Honor said it. But in this case, what Ms. Marvin was saying was, and I'm out of time, but may I finish answering the question? I'm satisfied. Okay. What she was trying to tell her was this could be a scam. No, if you're out of time, you're going to have to talk to the presiding judge. I don't have any authority over that. I'm willing to let you finish answering your question. Judge Ebel said he's satisfied. I'm satisfied right now. He's satisfied, so I guess he doesn't need an additional answer. So thank you. Okay. With that being said, Your Honors, since this is a de novo review, you can affirm on any grounds that were included in the moving papers that are in the record as well, and we submit. Thank you. Thank you. All right. I'm going to try to get a vagacy. Vagacy, Your Honor. Thank you. So briefly to respond on the issue of the conflicting extrinsic evidence here, there was not a direct conflict between the extrinsic evidence of the calls and what Ms. Hendricks said, what was pled in the complaint about Misty Hendricks's actual situation and ability to get money. The other cases referenced in the briefs that dealt with conflicting extrinsic evidence, such as Spruill, involved binary questions. So for example, what was the basis for the plaintiff's punishment by the NBA? Was it discrimination? No. The actual arbitration record attached showed that it was, in fact, misconduct. In Scott, the question was, was the driver speeding or not? Very easy, very easy to determine what conflicts. In Wend, did the bank have title or did it not have title? These are binary questions that are capable of being answered by extrinsic evidence here. It is at most ambiguous and at most an issue of credibility that could be sussed out during a deposition, during trial, but not a basis for dismissal and not a basis to ignore the rule that one interprets ambiguities of the extrinsic evidence in the favor of the non-moving party. Thank you. Thank you. Thank you both for your arguments this morning. This case is submitted and we'll take a 10-minute break. So I have 1015 right now, so we'll be back at 1025 for the fourth and final argument this morning. All rise. This court stands on recess for 10 minutes.
judges: Ebel, BADE, FORREST